IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | |
|---|---|
| KATHRYN A TENNEY, | ) CASE NO. 4:20-CV-01569-JG |
| | ) |
| Plaintiff, | ) JUDGE JAMES GWIN |
| | ) UNITED STATES DISTRICT JUDGE |
| v. | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) CARMEN E. HENDERSON |
| | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant, | ) |

**I. Introduction**

Plaintiff, Kathryn Tenney ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court REVERSE the Commissioner of Social Security's nondisability finding and REMAND this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**II. Procedural History**

On September 25, 2017, Claimant filed an application for SSI, alleging a disability onset date of February 28, 2017. (ECF No. 13, PageID #: 371). The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 13, PageID #: 305). On August 20, 2019, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 13, PageID #: 218). On September 9, 2019, the ALJ issued a written decision finding Claimant was

1

not disabled. (ECF No. 13). The ALJ's decision became final on June 23, 2020, when the Appeals Council declined further review. (ECF No. 13, PageID #: 82).

On July 16, 2020, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 14, 16, 18). Claimant asserts the following assignment of error:

> The decision is not supported by substantial evidence because the decision contains no discussion of Listing 14.10A Sjogren's Syndrome at Step Three, and the objective evidence raises a "substantial question" over whether this Listing is met or medically equaled.

(ECF No. 14 at 1).

### III. Background

#### A. Relevant Hearing Testimony

During the hearing, the following lines of questioning occurred:

> Q: . . . You said it's passing out due to the [postural orthostatic tachycardia syndrome]. Any other effects of that on you?
>
> A: The fast heart rate/irregular heartbeats contributes some to-
>
> Q: Yes.
>
> A: -- the fatigue –
>
> Q: Yes.
>
> A: -- because it's kind of like being in a permanent adrenaline rush and it makes my body very tired
>
> Q: Does it also cause nausea?
>
> A: Yes.
>
> Q: How often do you feel nauseous?
>
> A: Every day.

> Q: How much of the day are you nauseous?
>
> A: I would say maybe half to three-fourths of it. We have -- the vomiting has slowed down some to maybe three or four times a week, rather than every day.
>
> …
>
> Q: Okay. How does the Sjogren's, how does that manifest itself to you on a daily basis?
>
> A: It causes extreme dryness, like eyes and mouth, but also joints. So I get a lot of joint pain. My eyes were once so dry that they were cracked, which –
>
> Q: How often do you have joint pain?
>
> A: Every day
>
> Q: Does it prevent you from doing anything?
>
> A: Sometimes, yes, especially like my hands will swell and the joint pains, it'll be hard to grip things.
>
> Q: How often does that happen to you?
>
> A: Maybe three out of seven days

(ECF No. 13, PageID #: 235, 242–43). Claimant also testified that she had previously been in an exercise program for postural orthostatic tachycardia syndrome ("POTs"). However, she stated that they "kicked [her] out" in October 2018 because:

> At that point the vomiting was so bad that, even trying to do their program, I had my head in the bucket and they said it was just making it worse and then not doing anything because of that, everything got worse. And now the fatigue is so bad that even two minutes of exercise took me three days to recover from.

(ECF No. 13, PageID #: 245–46). The ALJ asked Claimant to describe what she had done the day before, if it was a normal day. The Claimant said it was and stated:

> I got up around 10:30. I had a cup of coffee. Then I was reclined on

3

> the couch until my mother got home at 4:30. Then I rode with her to pick up dinner and drop off dinner at my brother's. Then I came home, ate, showered and was reclined in bed until 10:30 and then I went to bed. . . . . [When reclined on the couch] I try to read. I haven't been doing as much. I spend a lot of time resting with my eyes closed. I don't sleep well without an aid, so even though I'm fatigued most of the day, it's hard to nap. So I spend a lot of time just kind of reclined with my eyes closed, resting.

(ECF No. 13, PageID #: 246–47).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's relevant health records and symptoms:

> [T]he claimant has a history of Sjogren's syndrome with a lip biopsy in early 2017 showing focal lymphocytic sialadentis (5F/67). The claimant underwent a bilateral functional endoscopic sinus surgery with bilateral maxillary antrostomies, left-sided front sinusotomy, and right-sided anterior and posterior ethmoidecotmy in February 2017 (5F/20-21). The claimant underwent an echocardiogram in March 2017, which was unremarkable (8F/19-20). In June 2017, the claimant was noted to have juvenile rheumatoid arthritis with treatment through Ketamine infusions (6F/1). She complained of fatigue and joint pain that was stable. Examination showed positive lower extremity edema (6F/1). Further, she complained of worsening symptoms following her loop recorder and gamma knife surgery for trigeminal neuralgia in late 2016 (10F/10). Diagnoses included orthostatic hypotension, edema, low back pain, chronic migraine, and trigeminal neuralgia (6F/2). Treatment from the Mercy Health Joint Care Clinic showed some confusion as to the claimant's diagnoses such as Sjogren's syndrome. However, the claimant continued to be treated for her various complaints of pain and neuropathy (7F/21-22).
>
> In August 2017, shortly before the protected filing date, the claimant reported that her main concern was fatigue. She reported that she exercised, wore compression stockings, and was well-hydrated (8F/1). Examination showed orientation to person, place and time, and normal range of motion in all extremities with no muscle weakness (8F/3). With regard to medication, for her postural orthostatic tachycardia syndrome ("POTS") the claimant was noted to have failed Florinef treatment as well as Mestinon (8F/3). Treatment continued with conservative measures (9F/5).
>
> During treatment in September 2017, the claimant presented with

4

her mother and a companion/therapy dog named Merlin. She stated that she walked with her dog, used apartment building fitness room, and exercised more than five times each week (10F/4). The claimant's mother stated during treatment that the claimant would get fuzzy vision after standing up and then would fall over. She denied true syncope or injuries (12F/26).

The claimant was treated with intractable nausea and vomiting with complaints of dysphagia in October 2017. The claimant was diagnosed with mild gastritis based upon EGD studies (17F/66). The claimant was admitted in late 2017 related to her nausea and vomiting. However, treatment records show no definitive diagnosis for her symptoms (17F/76). Examination showed no joint swelling, no joint tenderness, and no neurological findings (17F/72-73). During this period, the claimant received IV infusions for POTS symptoms and dehydration. Further, reported multiple syncopal episodes following the adrenaline rush of a motor vehicle accident (18F/23-25). The claimant underwent an examination in November 2017, which showed that she was blind in the right eye due to a macular scar. She had myopia and astigmatism in the left eye. She was diagnosed with poor binocular vision. The examining source wrote that the claimant should not work around heights or operate hazardous machinery (2F). Examination findings included normal gait and some tenderness in the elbows and wrists (18F/18-19). Treatment included low dose methotrexate at 10 mg weekly (18F/5).
. . .

On April 2018, the claimant underwent an MRI of the brain, which showed unremarkable findings. The claimant reported improvement of dysphagia since starting methotrexate in December 2017. However, she continued to receive PICC line IV fluid treatments due to difficulty swallowing (20F/2). Finally, the claimant was noted to have some improvement in her POTS symptoms with treatment (20F/3). In May 2018, the claimant reported improvement in her job pint with only some residual hip pain. She also reported that her hair loss was improved with methotrexate (21F/3). Examination findings showed no swelling, tenderness, loss of range of motion, or difficulty making fists (21F/6).

The record showed some complaints of waxing and waning symptoms. For instance, on May 30, 2018, she reported fluctuations in blood pressure, fatigue, and headaches. The claimant continued to present with a service dog and to receive ongoing infusions every four weeks following five consecutive days on IVIG therapy (22F). In June 2018, she presented with lower lumbar tenderness to palpation (24F/30). In July, she had erythematous rash on her hands

and trunk (24F/55).

On January 28, 2019, the claimant was noted to have a history of ankylosing spondylitis, though the record lacks evidence of this diagnosis in imaging studies (31F/16). With regard to her eyesight, the claimant was noted to be doing well with glasses, with the ongoing binocular limitations due to blindness in the right eye (33F/2). In March 2019, the claimant underwent physical therapy to work on symptoms of dizziness and nausea due to POTS (37F/8).

With regard to the claimant's mental impairments, the claimant underwent a consultative examination for the State Agency on December 18, 2017, with Jennifer Haaga, Psy.D. The claimant denied a history of abuse. She stated that she socialized with family and friends and occasionally attend[ed] church. She stated that she completed a college degree and was in graduate school part-time. The claimant reported diagnoses of anxiety, admitted to some mental health treatment, but no hospitalizations. She stated that she had side effects with psychotropic medications. During mental status examination, the claimant presented with good eye contact, and demonstrated adequate motivation. She had 100 percent intelligible speech, and was organized, coherent, and logical. She had somewhat down mood and blunted affect. She demonstrated no motor manifestations of anxiety, but stated that she experienced panic attacks. She[ wa]s oriented to person, place, time and situation. She had some limitations in memory, but presented with average range of intelligence. She had adequate attention and concentration. She was diagnosed with specified anxiety disorder, with some symptoms of panic attack and agoraphobia and unspecified depressive disorder (15F).

The record lacks formal mental health treatment notes. Rather, the claimant received occasional treatment in a primary care setting or emergency department setting where medications were changed. For instance, in October 2018, she was prescribed Zyprexa and decreased on Remeron, as well as continued on Ritalin for her complaints of low energy (26F/34). During a consultation on December 20, 2018, the claimant had anxious mood, depressed mood, fair insight and judgment and was oriented to person, place, time and situation. She had intact memory and impaired attention and concentration (28F/4).

In early 2019, the claimant reported improved mood, with some negative thinking and anxiety. The claimant reported that she had improvement with Abilify, which replaced Zyprexa (34F/3). Mental status examination showed anxious and depressed mood and fair

insight and judgement. She had some impaired attention and concentration (34F/40). However, the claimant reported that she was enrolled in school and was performing in an internship with some limitations due to vomiting (35F/9 and 37F/6).

(ECF No. 13, PageID #: 97–99).

### C. Opinion Evidence at Issue

#### 1. State Agency Consultants — Jennifer Haaga, Psy.D.

On December 18, 2017, State Agency consultant Jennifer Haaga, Psy.D., reviewed the claimant's medical record and opined that she was capable of comprehending and completing simple routine tasks as well as more complex tasks. She stated that the claimant would require reminders and assistance during periods of brain fog. She said the claimant would have difficulties with regarding to attention and concentration due to anxiety. She said that the claimant had no limitations in social interaction. Finally, she said the claimant's social structure would be positive with regard to her ability to manage workplace stressors, but stated that she would struggle in workplace settings where she felt that she was not able to successfully complete tasks (15F). . . .

(ECF No. 13, PageID #: 99). As to the persuasiveness, the ALJ found:

The opinion of Dr. Haaga is somewhat persuasive. She is an acceptable medical source who examined the claimant. Her opinion was vague and was of limited probative value in determining the claimant's residual functional capacity assessment. However, her opinion was generally consistent with the treatment records and complaints of difficulties with focus and anxiety. . . .

(ECF No. 13, PageID #: 99).

#### 2. State Agency Consultants — Theresa March, D.O and Sreenivas Venkatachala, M.D.

On December 9, 2017, State Agency consultant Theresa March, D.O., reviewed the claimant's medical record and opined that the claimant was limited to the light exertional level. She said the claimant could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday and sit (with normal breaks) for about six hours in an eight-hour workday. She said the claimant could never climb ladders, ropes or scaffolds. She said the claimant had limited near acuity, far acuity, depth perception, and

>accommodation with the left eye resulting in a need to avoid all exposure to hazardous heights or machinery (2A). On March 22, 2018, State Agency consultant Sreenivas Venkatachala, M.D., reviewed the updated record and opined that the claimant was limited to the light exertional level. However, he said the claimant could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds. He said the claimant could occasionally stoop, kneel, and crawl. He said the claimant was blind in the right eye and limited the claimant to no unprotected heights, heavy machinery and commercial driving (4A).

(ECF No. 13, PageID #: 100). As to the persuasiveness of these opinions, the ALJ stated:

>The State Agency consultant's opinions are somewhat persuasive. However, despite being acceptable medical sources who reviewed the claimant's medical record, the updated records suggest[] a limitation to the sedentary exertional level based upon ongoing complaints of nausea, near syncope, and complaints of fatigue.

(ECF No. 13, PageID #: 100).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

>2. The claimant has the following severe impairments: ankylosing spondylitis, fibromyalgia, postural orthostatic tachycardia syndrome ("POTS"), reflex sympathy dystrophy, Sjogren's syndrome, trigeminal neuralgia, vision loss, anxiety disorder, and depressive disorder (20 CFR 416.920(c)).
>
>3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
>4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can climb ramps and stairs occasionally, but never climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and crawl. The claimant has vision in the left eye only. The claimant can never work at unprotected heights, never around moving mechanical parts, and never operating a motor vehicle. The claimant is able to perform simple, routine and repetitive tasks but

> not at a production rate pace. The claimant is able to tolerate few changes in a routine work setting.

(ECF No. 13, PageID #: 95–96). For physical impairments, the ALJ explicitly considered only Listing 1.04—disorders of the spine. He did not make any reference to Listing 14.10—Sjogren's syndrome. He explained his finding regarding Listing 1:04:

> The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairment(s) medically equal a listed impairment. The claimant does not meet listing 1.04. Although the claimant has diagnoses of ankylosing spondylosis, the physical examination findings and imaging studies do not indicate significant difficulties with ambulation, neurological limitations, or even significant findings of pain to palpation or loss of range of motion in the spine (e.g., 8F/3; 17F/72-73; and 31F/16).

(ECF No. 15, PageID #: 94–95).

As for his residual functional capacity findings, the ALJ stated:

> The claimant's allegations regarding the nature of her symptoms and impairments are not fully consistent with the medical evidence of record. The record contains a great volume of treatment records, which show ongoing complaints of fatigue, vomiting, nausea, and near syncope. The claimant's treatment records show that she presented with a therapy dog. However, treatment records often showed unclear etiology of symptoms (7F/21-22, 9F/5; 12F/26; 18F/23-25). Regardless, she received treatment with a PICC line for fluids due to poor fluid intake (18F/23- 25). She testified that she could drive a vehicle, socialize, and take classes for a master's program and work on an internship (35F/9 and 37F/6). Treatment records lack evidence of a prescription for a wheelchair. Further, while the claimant reported that she passed out, the record lacks evidence of loss of consciousness.
>
> Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the medical evidence of record, the claimant's statements regarding the nature of her symptoms and impairments, and the opinion evidence as analyzed above.

(ECF No. 13, PageID #: 100).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404,

10

Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Plaintiff raises one issue on appeal: "[w]hether the ALJ's determination that Plaintiff did not meet Listing 14.10A is supported by substantial evidence." (ECF No. 14 at 15). Claimant argues that the ALJ's failure to discuss Listing 14.10A was reversible error because the evidence raised a substantial question over whether it was met. The Commissioner responds that "[w]hile the ALJ could have done a better job articulating his reasoning, it is clear from the record that the ALJ found that [Claimant] did not meet this listing and gave sufficient reasoning for his findings." (ECF No. 16 at 8).

#### 1. Step Three Listing Analysis

At Step Three, "an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review." *Christephore v. Comm'r of Soc. Sec.*, 11-13547, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416

11

(6th Cir. 2011). The ALJ "need not discuss listings that the applicant clearly does not meet." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record 'raises a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing. *Id.* (alteration in original) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990). "Failure to provide sufficient articulation of Step Three is error." *Garza v. Comm'r of Soc. Sec.*, No. 15-11507, 2016 WL 703038, at *4 (E.D. Mich. Jan. 22, 2016).

"[W]here, as here, the ALJ did not discuss the listing in question, the Court 'must determine whether the record evidence raises a substantial question as to [Claimant]'s ability to satisfy each requirement of the listing.'" *Wills v. Comm'r of Soc. Sec.*, No. 2:19-cv-11689, 2020 WL 1934932, at *5 (E.D. Mich. Apr. 21, 2020) (second alteration in original) (quoting *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014)). The claimant "must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing. Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (citations omitted). "If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled." *Id.* at 433 n.5. Nevertheless, that fact that the ALJ failed to specifically discuss a listing "does not require a remand if the ALJ 'made sufficient factual findings elsewhere in his decision to support his conclusion at step three.'" *Stamper v. Berryhill*, No. 5:16-131-KKC, 2017 WL 4287199, at *2 (E.D. Ky. Sept. 27, 2017) (quoting *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)).

Claimant alleges that the objective evidence of record raises a "substantial question" over whether Listing 14.10A—Sjogren's syndrome—was met. Although Claimant was diagnosed with

12

Sjogren's syndrome, this is not enough. "[T]he mere diagnosis of an impairment is not sufficient to establish disability; rather, disability is determined by the functional limitations imposed by a condition." *Miller v. Comm'r of Soc. Sec.*, No. 1:13 CV 763, 2015 WL 350570, at *12 (S.D. Ohio Jan. 26, 2015) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 2015)). Listing 14.10A requires:

> Involvement of two or more organs/body systems, with:
>
> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)

### a. Involvement of Two or More Organs/Body Systems with One at a Moderate Level of Severity

"Sjogren's syndrome is an immune-mediated disorder of the exocrine glands. Involvement of the lacrimal and salivary glands is the hallmark feature, resulting in symptoms of dry eyes and dry mouth, and possible complications, such as corneal damage, blepharitis (eyelid inflammation), dysphagia (difficulty in swallowing), dental caries, and the inability to speak for extended periods of time." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00 (D)(7)(a)(i). Other organ systems that may be involved include "musculoskeletal (arthritis, myositis), respiratory (interstitial fibrosis), gastrointestinal (dysmotility, dysphagia, involuntary weight loss), genitourinary (interstitial cystitis, renal tubular acidosis), skin (purpura, vasculitis), neurologic (central nervous system disorders, cranial and peripheral neuropathies), mental (cognitive dysfunction, poor memory), and neoplastic (lymphoma)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00 (D)(7)(a)(ii).

Claimant asserts that her Sjogren's syndrome involves at least eight body systems to a moderate degree. Commissioner does not appear to refute this argument. Indeed, Claimant produced evidence of her Sjogren's syndrome involving at least two—and likely more—organs or body systems. For example, her symptoms involved her opthalmologic system through extremely

13

dry eyes and her gastrointestinal system due to dysphagia and gastroparesis. In addition, Claimant produced evidence of the involvement of her skin (blisters, rash, hair loss), musculoskeletal system (joint pain, stiffness, and swelling), and cardiovascular system (orthostatic tachycardia), among others. As such, the Claimant has met her burden with regards to the involvement of at least two organs or body systems with at least one to a moderate degree.

### b. Involvement of at least two of the Constitutional Symptoms

Claimant also needs to show that she provided evidence of involvement of at least two of the constitutional symptoms. Claimant alleges that she "consistently suffered" with fatigue and malaise. (ECF No. 14 at 19). She also notes that the record contains evidence of fever and unintentional weight loss, but with less consistency.

The ALJ's analysis of whether Claimant suffers from "malaise" is lacking. "Malaise" is defined as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(C)(2). Claimant consistently complained to doctors about nausea and vomiting. She testified that she is nauseous half to three-fourths of every day and throws up three to four times a week. (ECF No. 13, PageID #: 235–36). After attempting an exercise program for POTs, she was "kicked out" because she was "vomiting so bad." (ECF No. 13, PageID #: 245–46). There was also evidence of headaches, sleep disruption, brain fog, and body and joint pain. (ECF No. 13, PageID #: 610, 614, 682). The ALJ specifically stated that Claimant's "updated records suggest[] a limitation to the sedentary exertional level based upon ongoing complaints of nausea, near syncope, and complaints of fatigue," indicating a significant reduction in physical activity. (ECF No. 13, PageID #: 100). Clearly, this is substantial evidence of malaise—something the ALJ failed to discuss.

The more difficult determination is whether Claimant produced evidence of "severe fatigue" and, if she did, whether the ALJ, in discussing her symptoms generally, already found that her fatigue was not severe. Claimant points to various places in the record that evidence fatigue. Commissioner has three responses which will be addressed in turn.

First, the Commissioner argues that nothing in the record proves that Claimant's fatigue was caused by Sjogren's syndrome, as the cause of her symptoms was never evident to her doctors or in the record. (ECF No. 16, at 10). While it's true that Claimant's doctors were not always sure which of her impairments caused her symptoms, the Court finds no support for notion that there must be direct evidence of causation in this way. At Step Three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of a Listed Impairment. 20 C.F.R. § 404, Subpart P, Appendix 1; *see also Ramirez v. Comm'r of Soc. Sec.*, No. 5:18-cv-2140, 2019 WL 5802512, at *13 (N.D. Ohio June 19, 2019) ("[A]n ALJ must consider whether a claimant's [impairment], singly or in combination with other medically determinable impairments, causes functional limitations that medically equal a listed impairment."). A claimant who meets the requirements of the Listings is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Claimant produced evidence that she suffered from fatigue and malaise, whether it was caused wholly by Sjogren's syndrome or in combination with her other impairments, makes no difference if she meets the Listing's requirements. Thus, the Commissioner's first argument is unavailing.

Second, the Commissioner asserts that the ALJ made several findings inconsistent with a conclusion that Claimant's symptoms met the severity requirements of Listing 14.10A. (ECF No. 16, at 11). "Severe fatigue" is defined as "frequent sense of exhaustion that results in significantly reduced physical activity or mental function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(C)(2). Claimant consistently complained to her doctors of fatigue. She testified that if she worked out for

15

two minutes, she needed three days to recover. She testified that she spends most of her day reclined in a chair due to fatigue. The ALJ, however, did not explicitly evaluate whether Claimant experiences severe fatigue or even address fatigue specifically. The ALJ only made findings about Claimant's symptoms generally. He stated:

> The claimant's allegations regarding the nature of her symptoms and impairments are not fully consistent with the medical evidence of record. The record contains a great volume of treatment records, which show ongoing complaints of fatigue, vomiting, nausea, and near syncope. . . . However, treatment records often showed unclear etiology of symptoms (7F/21-22, 9F/5; 12F/26; 18F/23-25). . . . She testified that she could drive a vehicle, socialize, and take classes for a master's program and work on an internship (35F/9 and 37F/6). . . . Further, while the claimant reported that she passed out, the record lacks evidence of loss of consciousness. . . .
> Based on the foregoing, I find claimant has the above residual functional capacity assessment . . . .

(ECF No. 13, PageID #: 95). He also stated that Claimant was limited to the sedentary exertional level "based on ongoing complaints of nausea, near syncope, and complaints of fatigue." (ECF No. 13, PageID #: 100). It is not clear to the Court what exactly the ALJ found regarding Claimant's fatigue. This explanation fails to build a logical bridge for the Court to understand Claimant's degree of fatigue severity.

Finally, it appears the Commissioner asks the court to reweigh the evidence and consider the opinion of Dr. Sreenivas, the state agency reviewing physician. (ECF No. 16, at 11). The Commissioner states that Dr. Sreenivas considered Listing 14.10 and opined that Plaintiff could perform a range of light work, exceeding what the ALJ ultimately found. It is not the job of the court to reweigh evidence. The Court notes, however, that the opinion relied on by the Commissioner was given before Claimant updated the record. Disagreeing with Dr. Sreenivas, the ALJ specifically found that the "updated records suggest[] a limitation to the sedentary exertional level based upon ongoing complaints of nausea, near syncope, and complaints of fatigue. (ECF

16

No. 13, PageID #: 100). Further, "regardless of whether this Court is of the opinion that the evidence establishes (or fails to establish) the presence of "severe fatigue," it is up to the ALJ to make that determination, particularly where there is *some* evidence in the record that [Claimant] suffers from what seems to be an abnormal degree of fatigue." *Garza*, No. 15-11507, 2016 WL 703038, at *5.

Considering the relevant evidence, it is certainly possible that the ALJ could have concluded that Claimant met the requirements of Listing 14.10A had he properly considered it. There is at least some evidence in the record of the involvement of multiple organs or body systems to a moderate degree and severe fatigue and malaise. "And, while the ALJ may well reach the same ultimate conclusion on remand regarding [Claimant's] entitlement to benefits, the Court cannot say that, if the ALJ had conducted a proper Step Three analysis, he necessarily would have found that [Claimant] does not meet or medically equal the relevant Listing." *Garza*, No. 15-11507, 2016 WL 703038, at *7 (footnote omitted). Accordingly, the decision should be remanded for proper evaluation and explanation of Listing 14.10A.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court REVERSE the Commissioner of Social Security's nondisability finding and REMAND this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

Dated: September 7, 2021

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

**OBJECTIONS**

17

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).